UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

LECTRA USA, INC. and
LECTRA S.A.,

      Plaintiffs

v.

EASTMAN MACHINE COMPANY AND
SEWN PRODUCTS EQUIPMENT CO.,

      Defendants.

Case No. 08-CV-0213-RWS

## DEFENDANTS' RESPONSIVE CLAIM CONSTRUCTION BRIEF

**HODGSON RUSS LLP**
Robert J. Lane, Jr.
admitted *pro hac vice*
*rlane@hodgsonruss.com*
Robert J. Fluskey, Jr.
admitted *pro hac vice*
*rfluskey@hodgsonruss.com*
The Guaranty Building
140 Pearl Street, Suite 100
Buffalo, NY  14202-4040
716.856.4000

**BRYAN CAVE POWELL GOLDSTEIN**
Ryan Pumpian, Esq.
GA Bar No. 589822
*rpumpian@bryancave.com*
One Atlantic Center – 14th Floor
1201 W. Peachtree St., NW
Atlanta, GA 30309
404.572.6581

**Attorneys for Defendants Eastman Machine
Company and Sewn Products Equipment Co.**

# **TABLE OF CONTENTS**

PAGE

Preliminary Statement ................................................................................1

Claim Construction Arguments ..................................................................3

I.          Working Window .........................................................................3

    A.     The Working Window Is an Area Entirely Within the Working Zone
            that Confines Operation of the Tool.......................................8

    B.     The Dimensions of the Working Window Remain Fixed During
            a Job....................................................................................11

    C.     The Working Window Has a Length Equal to or Greater than Half the
            Length of the Working Zone, but Less than the Full Length of The
            Working Zone......................................................................13

    D.     Lectra Provides No Support For Its Construction..............14

II.         Shifting The Working Window...................................................17

III.        Predetermined Working Zone ...................................................19

IV.        Intermittently Advanced............................................................20

V.         A Length In The Direction of The Advance of The Material.............23

Conclusion ................................................................................................25

# TABLE OF AUTHORITIES

<u>PAGE</u>

**FEDERAL CASES**

*Accuscan, Inc. v. Xerox Corp,*
　　2003 WL 22148905 (Fed. Cir. 2003) ................................................................10

*Biogen, Inc. v. Berlex Labs., Inc.*,
　　318 F.3d 1132 (Fed. Cir. 2003) ....................................................................4, 22

*Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*,
　　93 F.3d 1572 (Fed. Cir. 1996) ............................................................................5

*Fantasy Sports Properties, Inc. v. Sportsline.com, Inc.*,
　　287 F.3d 1108 (Fed. Cir. 2002)…………………………………………..4, 5, 10

*Freedom Wireless, Inc. v. Boston Communications Group, Inc.*,
　　2003 WL 25783583 (D. Mass. April 23, 2003) …………………...........4, 22

*Gen. Am. Transportation Corp. v. Cyro-Trans, Inc.*,
　　93 F.3d 766 (Fed. Cir. 1996)……………………………………………13, 16

*Gen. Elec. Co. v. Joiner*,
　　522 U.S. 136 (1997)........................................................................................12

*Genentech, Inc. v. Boehringer Mannheim GmbH*,
　　989 F. Supp. 359 (D. Mass. 1997)......................................................................5

*Genentech, Inc. v. Novo Nordisk*,
　　108 F.3d 1361 (Fed. Cir. 1997) ..........................................................................9

*In re Gabapentin Patent Litig.*,
　　503 F.3d 1254 (Fed. Cir. 2007) ........................................................................16

*Intervet Am., Inc. v. Kee-Vet Labs., Inc.*,
　　887 F.2d 1050 (Fed. Cir. 1999) ....................................................................5, 22

*Lippe v. Bairnco Corp.*,
　　288 B.R. 678 (S.D.N.Y. 2003) ........................................................................12

i

## TABLE OF AUTHORITIES - cont'd

PAGE

*Merck & Co., Inc. v. Teva Pharms. USA, Inc.*,
   395 F.3d 1364 ...................................................................................16

*Netword, LLC v. Centraal Corp.*,
   242 F.3d 1347 (Fed. Cir. 2001) ..............................................4, 5, 22

*North Am. Vaccine, Inc. v. Cyanamid Co.*,
   7 F.3d 1571 (Fed. Cir. 1993) ........................................................4, 5

*Parker-Hannifin Corp. v. Wix Filtration Corp.*,
   2008 WL 697510 (E.D. Cal. March 14, 2008) ...............................5, 6

*Phonometrics, Inc. v. Northern Telecom, Inc.*,
   133 F.3d 1459 (Fed. Cir. 1998)…………………………………………6

*Unique Concepts, Inc. v. Brown*,
   939 F.2d 1558 (Fed. Cir. 1991) …………………………………….16


**RULES**

Fed. R. Evid. 702 ......................................................................................12


**OTHER AUTHORITIES**

Webster's Ninth New Collegiate Dictionary .............................................24

Webster's Third New International Dictionary .........................................17

Robert C. Kahrl, PATENT CLAIM CONSTRUCTION § 5.03[A], 5-36…………………4

**Preliminary Statement**

The claimed invention of U.S. Patent No. 5,867,392 (the "'392

Patent") is very narrow in scope.  The specification itself makes clear that prior art

cutting systems were capable of "cutting on the fly" — *i.e.,* those systems could

cut material as the material moved along a conveyor.  Col. 2:4-22; Lectra Br. at 3.[1]

To overcome a prior art reference that disclosed cutting on the fly, Lectra was

forced to add the "working window" limitation to all independent claims and to

abandon its "second implementation," which did not utilize a working window.

Eastman Br.[2] at 4-7; Ex. 3[3] at L01126-30.  Lectra apparently persuaded the Patent

and Trademark Office (the "PTO") that use of a working window separated the

'392 invention from the prior art.  In a "bait and switch" maneuver, having relied

on the working window limitation to obtain the '392 Patent, Lectra now urges the

Court to adopt broad, contentless definitions of claim terms that effectively read

out the working window limitation from the claimed invention.

---

[1]     "Lectra Br." refers to Lectra's Opening Claim Construction Brief.

[2]     "Eastman Br." refers to Defendants' Opening Claim Construction Brief.

[3]     All references to "Ex. __" are to the exhibits submitted by the defendants in
support of their Opening Claim Construction Brief.

The recurring theme in Lectra's Opening Claim Construction Brief is that Eastman's constructions "import" limitations from the specification. This argument fundamentally misconstrues the task before the Court. This is a case in which the parties agree that the central terms in dispute — "working window" and "shifting the working window" — have no ordinary meaning to one of skill in the art. By examining the specification to support its constructions, Eastman is not limiting the scope of commonly known terms. It is defining the terms by reference to all disclosures in the specification — *the source* of what the terms mean. Lectra's constructions, on the other hand, require the Court to disregard all references to the working window in the patent itself, and to create a working window concept that is neither disclosed nor enabled.

Lectra's definitions of "predetermined working zone," "intermittently advanced," and "a length in the direction of the advance of the material" are unsupportable and contrary to settled rules of claim construction. Lectra argues that the working zone is the entire table and includes areas where no work can occur, a construction that renders the words "predetermined" and "working" superfluous. Lectra uses the unambiguous term "intermittently advanced" as a vehicle for adding a feature to the patent that is not claimed or disclosed in an attempt to overcome prior art. Lectra's construction of "a length" allows for the

2

working window to transform itself and take on multiple, immeasurable lengths during one cutting job, a concept that is precluded by the claim language and which was never disclosed in the specification.

<u>**Claim Construction Arguments**</u>

**I.     <u>WORKING WINDOW</u>**

Lectra's only argument in opposition to Eastman's construction of "working window" is that the construction adds "extraneous" limitations from the specification. Lectra Br. at 18-21. This misses the point entirely. The parties agree that "working window" has no ordinary meaning to one of skill in the art.[4] Because the term has no plain meaning, the disclosures of the specification must define it. In these circumstances, examining the disclosures in the specification to identify the features of a "working window" does not improperly limit the established meaning of a known term; it is the only process available to the Court for defining an otherwise entirely unknown and meaningless term.

Indeed, the specification is the definitional source for claim interpretation in cases where the meaning of the disputed term is in doubt or where

---

[4]     Lectra Br. at 21, n.13; Ex. 6 ¶¶ 8-10; Ex. 7 ¶¶ 9-10; Ex. 8 at 21-24; Ex. 10 at 198-200; Exs. 15-16.

3

parties agree that the disputed term has no ordinary meaning.[5]  *Freedom Wireless,*

*Inc. v. Boston Communications Group, Inc.*, 2003 WL 25783583 (D. Mass. April

23, 2003) is instructive.  A key term in dispute in that case was "pre-paid switching

system," which had "no ordinary meaning at the time the application was filed."

*Id.* at *4.  Like the "working window" limitation in the '392 Patent, the "pre-paid

[telephone] switching system" was so central to the patent that it "essentially ***is*** the

invention described . . . in that it performs the functions that provide the

advantages over prior art . . . ."  *Id.*  Accordingly, the court defined the term by

reference to the specification, *id.*, and explained that a proper construction must be

limited to the inventor's disclosure of that term in the specification:

> The claims are directed to the invention that is
> described in the specification; they do not have
> meaning removed from the context from which
> they arose . . . .  Although the specification need
> not present every embodiment or permutation of

---

[5]      *Fantasy Sports Properties, Inc. v. Sportsline.com, Inc.*, 287 F.3d 1108,
1114-1115 (Fed. Cir. 2002); *Freedom Wireless, Inc. v. Boston
Communications Group, Inc.*, 2003 WL 25783583 (D. Mass. April 23,
2003), *vacated on other grounds*.  *See also Biogen, Inc. v. Berlex Labs.,
Inc.*, 318 F.3d 1132, 1140 (Fed. Cir. 2003); *Netword, LLC v. Centraal
Corp.*, 242 F.3d 1347, 1352-1353 (Fed. Cir. 2001); Robert C. Kahrl,
PATENT CLAIM CONSTRUCTION § 5.03[A], 5-36 ("When a claim term has no
commonly understood meaning, the specification becomes the source of
illumination.").

> the invention and the claims are not limited to the preferred embodiment of the invention, ***neither do the claims enlarge what is patented beyond what the inventor has described as the invention***.

*Id.* at *2 (emphasis added). *Fantasy Sports Properties, Inc. v. Sportsline.com, Inc.*, 287 F.3d 1108 (Fed. Cir. 2002) is also on point. There, the Federal Circuit upheld the district court's construction of "bonus points" (a term that had no ordinary meaning in the game of football) as limited to additional points awarded on scoring plays. *Id.* at 1113-1115. In reaching its conclusion, the Federal Circuit examined the disclosures in the specification, all of which described bonus points as points awarded for unusual scoring plays. *Id.* at 1115.[6] This approach is consistent with the basic principle that a Court should not adopt a construction that is neither disclosed nor enabled.[7]

Lectra's "importation" argument confuses the distinction between using the specification to define a term used in a claim, which is proper (indeed, required), and using the specification to add a concept not present in a claim, which is not proper. "A district court does not import additional limitations into

---

[6] The court also relied on the doctrine of prosecution history disclaimer, which also applies here and is discussed below.

[7] *North Am. Vaccine, Inc. v. Cyanamid Co.*, 7 F.3d 1571, 1577 (Fed. Cir. 1993); *Genentech, Inc. v. Boehringer Mannheim GmbH*, 989 F. Supp. 359, 370-71 (D. Mass. 1997).

the claim when it looks to the specification to aid its interpretation of a term already in the claim, an entirely appropriate practice."[8]  Even the case that Lectra cites on this issue, *Intervet Am., Inc. v. Kee-Vet Labs., Inc.,* 887 F.2d 1050, 1053 (Fed. Cir. 1999), cautions that "interpreting what is *meant* by a word *in* a claim 'is not to be confused with adding an extraneous limitation appearing in the specification'" (emphasis in original); *see* Lectra Br. at 8.

The central term at issue here — "working window" — has no meaning to one of skill in the art.  It is the feature that, according to Lectra's prosecution attorneys, separated the invention from the prior art.  Ex. 3 at L01107, L01126-30.  Lectra emphasized this point in footnote 13 of its Opening Claim Construction Brief.  Thus, the disclosures in the specification provide the meaning of "working window"; they do not narrow a concept that one of skill in the art already understands to be broader than what the specification shows.  Further, "working window" appears in independent claims 1 and 7, so by defining the term

---

[8]     *Parker-Hannifin Corp. v. Wix Filtration Corp.*, 2008 WL 697510, at *7 (E.D. Cal. March 14, 2008) (citing *Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*, 93 F.3d 1572, 1578 (Fed. Cir. 1996)).  *See also Phonometrics, Inc. v. Northern Telecom, Inc.*, 133 F.3d 1459, 1466 (Fed. Cir. 1998) ("[The patentee] of course argues that additional limitations cannot be imported into a claim from the written description. We may, however, construe a specifically claimed limitation in light of the specification, which is all we do here.").

based on the disclosures in the specification, Eastman is not writing "additional limitations into the claim," it is "look[ing] to the specification to aid its interpretation of a term already in the claim." *Parker-Hannifin Corp.*, 2008 WL 697510, at *7.

The working window disclosed in the '392 Patent always has the following features: (1) it is entirely within the working zone and confines operation of the tool; (2) its dimensions remain fixed during a job; and (3) its length is equal to or greater than half the length of the working zone, but less than the full length of the working zone. [9] Lectra argues that there is no reason that a working window necessarily must have these features. Lectra Br. at 18-21. But in the circumstances at issue here — where the term "working window" has no meaning apart from what is disclosed in the specification — the Court can only define the term as including all of the features the specification discloses. What basis can Lectra point to for dropping any of the features of working window that are disclosed in the specification? Because "working window" has no meaning apart from the disclosures in the specification, there is no basis — every working

_____

[9]    Cols. 2:46-3:22, 5:15-6:49; FIGs. 2A-2D, 4A-4D.

window described in the '392 Patent contains each feature included in Eastman's proposed claim construction.

## A.  The Working Window Is an Area Entirely Within the Working Zone that Confines Operation of the Tool

Consistent with its misguided theme, Lectra criticizes this aspect of Eastman's construction, claiming that "[n]one of the claims impose, directly or by implication, these limitations on the working window."  Lectra Br. at 19.  The location of the working window within the working zone is not a "limitation"; it is a necessary component of the working window concept disclosed and explained in the patent.  The only working window disclosed remains entirely within the working zone during a cutting job.  Cols. 2:46-3:22, 5:15-6:49; Figs. 2A-2D, 4A-4D.

Lectra contends that one of ordinary skill would "recognize that at any given moment in time the 'working window' could encompass in part material that was not yet on the cutting machine table, *i.e.*, was not yet in the working zone."  Lectra Br. at 19.  In support, Lectra cites only figures 5A–5D and accompanying text.  But those figures and text relate to the second implementation of the invention, which clearly does not utilize a working window and which was abandoned during prosecution.  Col. 6:50-8:37; Ex. 3 at L01093-95, L01126-30;

8

Eastman Br. at 4-7.  As Lectra's witnesses acknowledged during depositions, no working window is depicted on these figures, nor does the text of the patent describing these figures utilize the term "working window."  Ex. 8 at 42-45; Ex. 9 at 87-89, 105-106.  The concept exists only in their minds (Ex. 8 at 42-45 and Ex. 9 at 94), and as a matter of law, that is not a disclosure sufficient to support a claim construction.[10]

Notably, Lectra admits that the working window contains the features that require it to be entirely within the working zone at all times.  Lectra agrees that the working window is an area that confines operation of the tool.  Lectra Br. at 17.  Lectra also agrees that the length of the working window must be less than the length of the working zone.  Lectra Br. at 19.  Because the working window is an area in which the tool operates, the working window must be within the working zone.  Clearly, the tool is not capable of plotting or cutting material off of the table.  Lectra's indefinite construction — "area defining a segment of material to be cut" — does not include the features that Lectra concedes are a necessary part of the claimed invention.

---

[10]    *Genentech, Inc. v. Novo Nordisk*, 108 F.3d 1361, 1366 (Fed. Cir. 1997) ("It is the specification, not the knowledge of one skilled in the art, that must supply the novel aspects of an invention in order to constitute adequate enablement.").

Lectra's construction is also precluded by the prosecution history.  In an attempt to overcome the Campbell patent, Lectra's attorney explained several times during prosecution that the working window was the area in which the tool operated and that the tool always remained in the working zone.  *See, e.g.*, Ex. 3 at L01107 ("There is no disclosure in Campbell concerning the ***control of the tool in a work window*** that is smaller than the length of the cutting section . . . .Campbell does not disclose that ***the tool remains in the working zone after advancing the material.***").  Thus, a construction that places the tool-confining working window off of the table defies logic and is contrary to statements made during prosecution in an attempt to overcome prior art.  Lectra has disclaimed any construction that allows the working window to exist outside the working zone.[11]

---

[11]    *Fantasy Sports Properties, Inc.,* 287 F.3d at 1115 (holding that the patentee disclaimed any interpretation of "bonus points" that included scoring methods disclosed in a prior art reference that the patentee overcame through a narrowing amendment); *Accuscan, Inc. v. Xerox Corp,* 2003 WL 22148905, at *1-2 (Fed. Cir. Sept. 15, 2003) (recognizing that under the doctrine of "prosecution history disclaimer" a patentee cannot recapture through claim construction meanings disclaimed during prosecution).

**B.     The Dimensions of the Working
       <u>Window Remain Fixed During a Job</u>**

Lectra argues that this aspect of Eastman's construction is also an

"extraneous limitation." Lectra Br. at 20-21. To the contrary, the claims and

specification of the '392 Patent require that the working window's dimensions

remain fixed during a job. The specification discloses only a working window

with a fixed length. *See* cols. 2:46–3:21, 5:15–6:49; FIGs. 2A–2D, 4A–4D. And

Lectra's witnesses have admitted that the '392 Patent does not disclose or depict a

working window whose length changes during a cutting job. Ex. 8 at 42-45;

Ex. 10 at 180-81; Ex. 9 at 87-88, 105-106. Lectra attempts to create a size-

changing working window by relying on its expert, Mr. Herman, who opines that

"a person of ordinary skill would recognize from Figures 5A through 5D that the

dimensions of the working window could change during a job." Lectra Br. at 21.

Mr. Herman's opinion on this point actually supports Eastman's construction in

several respects.

First, his opinion acknowledges that figures 5A–5D do not depict a

working window. According to Mr. Herman, a person of ordinary skill would

"recognize" (*i.e.*, imagine) from these figures that the dimensions of a working

window could change. He does not explain how; nor does he claim that a working

11

window is shown in figures 5A–5D.  This is consistent with his deposition testimony, where he admitted that no working window appears in figures 5A-5D and that he only "implies" its existence.  Ex. 8 at 42-45.

Second, Mr. Herman's opinion recognizes that a size-changing working window is a hypothetical concept that is not explained in the patent.  He argues that one of ordinary skill would recognize how the dimensions of the working window *could change* during a job.  Mr. Herman is careful not to say that figures 5A–5D or the text accompanying them depicts or describes a working window that *does* change size.  How that imaginary, hypothetical size change could occur is not disclosed or enabled.

Third, as Eastman anticipated in its Opening Claim Construction Brief, figures 5A–5D are the only part of the '392 Patent in which Mr. Herman claims to be able to imagine a size-changing working window, and those figures depict the "second implementation" of the invention, which does not utilize a working window and which was abandoned during prosecution.  Eastman Br. at 4-7; Cols. 6:50-8:37; Ex. 3 at L01093-95, L01126-30.

Finally, Mr. Herman fails to provide an explanation of how figures 5A–5D enable one of ordinary skill to imagine the existence of a working window

12

that changes its length during a cutting job.  His opinion is nothing more than a

conclusory statement, and therefore, it is entitled to no evidentiary weight.[12]

**C.  The Working Window Has a Length Equal to or
     Greater than Half the Length of the Working Zone,
     but Less than the Full Length of The Working Zone**

Lectra asserts that this aspect of Eastman's construction "improperly

limits 'working window' to an embodiment in the specification."  Lectra Br. at 19.

Lectra is wrong.  Eastman has construed working window by reference to ***all of the

embodiments*** disclosed and claimed in the '392 Patent.[13]  The claims disclose only

a working window that is either equal to half the length of the working zone, or

greater than half the length of the working zone but less than the full length of the

working zone.  The specification discloses only these two variants, and the '392

Patent does not disclose or enable an invention utilizing a working window with

any other size.  Eastman is utilizing the specification to define a term that has no

---

[12]  *Lippe v. Bairnco Corp.*, 288 B.R. 678, 686-89 (S.D.N.Y. 2003) (excluding
expert testimony because opinions were based solely on the expert's "say-
so" and failed to explain how conclusions were reached) (citing *Gen. Elec.
Co. v. Joiner*, 522 U.S. 136, 146 (1997)); *cf.* Fed. R. Evid. 702 (advisory
committee notes to 2000 amendments) ("The trial court's gatekeeping
function requires more than simply 'taking the expert's word for it.'").

[13]  *See Gen. Am. Transportation Corp. v. Cyro-Trans, Inc.*, 93 F.3d 766, 770
(Fed. Cir. 1996) (defining a term by reference to the disclosures in the
specification and explaining:  "This is not just the preferred embodiment of
the invention; it is the *only* one described.") (emphasis in original).

ordinary meaning to one of skill in the art; it is not importing a limitation from the specification to narrow a term that has a common meaning.

## D.     Lectra Provides No Support For Its Construction

Lectra's description of the "working window" as a "parameter-defined" area that floats atop a segment of material finds absolutely no support in the '392 Patent.  Lectra Br. at 16-18.  The word "parameters" does not appear anywhere in the sections of the specification that discuss the first implementation — the only implementation that utilizes a working window.  The word appears only once, at column 7, line 40, a passage dedicated exclusively to the second, unclaimed implementation.  *See* col. 6:50–8:37.

Lectra's assertion that the working window "floats atop a segment of material" is undermined by the sections of the specification that Lectra cites. Lectra Br. at 17 (citing cols. 2:46-3:9, 5:26-58, 6:20-8:27; FIGs. 2A-2D, 4A-4D, 5A-5D).  In these sections of the specification, the working window is described as an area with a fixed length that confines operation of the tool and which shifts upstream after certain paths within it have been traveled.  Cols. 2:46–3:9; 5:15–61. The movement of the working window operates independently from the advance of

the material.  Nothing in the specification states that the working window is

somehow linked to the material, as Lectra implies.

Lectra contends that its proposed phrase "successive parameters of the

working window may overlap" makes it clear that the working window is

"parameter defined."  Lectra Br. at 18.  But again, the word "parameters" (or its

meaning) is never used in connection with any discussion of the working window

throughout the entire '392 Patent.  More important, the word "parameters" does

not appear in independent claims 1 and 7.  Those claims define the working

window as having a length that is less than the length of the working zone.

Lectra's argument that the length of the working window is a "parameter" of the

working window necessarily fails.  Claims 1 and 7 do not use the term parameter

when defining the working window's length.  Lectra's construction effectively

substitutes the word "parameter," which is never used in connection with working

window, in place of the phrase "a length," which is used in both independent

claims and consistently throughout the specification's description of the working

window.  Cols. 2:46-3:22, 5:15-6:49.

Lectra's construction is so broad and functionally meaningless that it

effectively removes the working window limitations from the claims.  Such a

15

construction is improper.[14]  Lectra's approach is particularly improper here, as the

working window limitations were necessary for patentability.  Lectra convinced

the PTO that the "working window" was such a significant feature that it alone

separated the invention from the prior art.  Lectra now argues that the working

window is nothing more than an area where a segment of material is to be cut.  All

cutting machines have an area where a segment of material is to be cut.  The

working zone, as described in the '392 Patent, can be characterized as an area

where a segment of material is to be cut.  Lectra should not be permitted to

broaden the claim beyond meaning to lay the foundation for a flexible

infringement analysis that would allow it to argue to a finder of fact that

essentially every cutting or plotting machine uses a working window.

---

[14]     *See, e.g.*, *Merck & Co., Inc. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) (recognizing that a court should not adopt a construction that would eliminate a limitation); *Elekta Instrument S.A. v. O.U.R. Scientific Int'l*, 214 F.3d 1302, 1307 (Fed. Cir. 2000) (construing term to avoid reading latitude limitation out of claims); *Gen. Am. Transportation Corp.*, 93 F.3d at 770 (rejecting district court's construction because it rendered a limitation superfluous); *Unique Concepts, Inc. v. Brown*, 939 F.2d 1558, 1562 (Fed. Cir. 1991) (refusing to adopt a construction that merged two separate limitations and noting that such a construction violates the "all elements rule" of infringement).

16

## II.    SHIFTING THE WORKING WINDOW

Lectra's construction of "shifting the working window" as "adjusting the parameters of the working window" is disguised reference to Lectra's real position — that the dimensions of the working window can change during a cutting job.  It is apparently based on the following argument:

> [T]he working window is a floating window whose parameters are controlled by software. Correspondingly, therefore, Lectra's proposed construction defines "shifting the working window [toward the upstream end of the working zone]" as "adjusting the parameters of the working window [to cover the next upstream segment of material to be cut]."

Lectra Br. at 25.

Lectra's position makes no sense.  Moreover, Lectra's basic premise — that the working window is a "floating window whose parameters are controlled by software" — is never disclosed in the '392 Patent.  The word parameter is never used in connection with any description of the working window, nor is there any disclosure of how the working window's "parameters" are controlled by software. Lectra never cites to or discusses the language of claims 1 and 7 throughout its entire discussion of this term.  Lectra Br. at 25-27.  This is because the plain

17

meaning of the word "shifting," [15] as used in those claims, is "moving."  The

language of Claim 1, which refers to "shifting the working window ***toward*** the

upstream end of the working zone," makes it perfectly clear that the location of the

working window is moved.  There is no indication that the dimensions of the

window can change.

   Recognizing that the specification does not use the word "parameters"

when explaining the working window, Lectra argues that when the patentee used

the word "origin," he was really referring to a "parameter."  *See* Lectra Br. at 26.

Nothing in the specification supports this argument.  In fact, the section of the

specification that Lectra quotes at page 26 of its Opening Claim Construction Brief

makes clear that shifting the working window means moving the working window,

and that the length of the working window does not change when its shifts.  Lectra

selectively quotes the phrase "the origin of the window is positioned at the abscissa

L/2" and claims that this is a reference to adjusting the parameters of the working

---

[15]  The plain meaning of "shift" is "to change the place, position, or direction
   of . . . ."  Ex. 4 (Webster's Third New International Dictionary) at
   EAST003508.

window.  But the complete passage provides as follows:

> Once this initial stage has been performed, the working window 20A is ***shifted upstream*** so as to occupy the upstream half of the working zone 20 (the origin of the window is positioned at the abscissa L/2), the tool is brought into the window, and the material 22 is caused to advance.  (Fig 2C.)

Col. 5:37-40 (emphasis added).  This passage defines a working window with a fixed length (half the length of the working zone) that is moved upstream to the upper half of the working zone after paths within the working window are traveled by the tool.  When the working window shifts upstream (*i.e.,* moves its location), its dimensions do not change.

Contrary to Lectra's assertion, Eastman's construction does not require that the "working window" is a physical component of the cutting machine. Lectra Br. at 27.  How does the word "moving" suggest more of a physical connection with the machine than the word "shifting"?  Lectra provides no answer.

## III.    PREDETERMINED WORKING ZONE

Lectra's position that the predetermined working zone includes the entire surface of the table, and thus areas where no work can occur, is plainly illogical.  It is also contradicted by the claim language.  Claim 7 makes clear that

19

the working zone cannot be the entire surface of the cutting table: "a working surface on which the material is disposed ***and including a predetermined working zone"*** (emphasis added).

Lectra's construction renders the words "predetermined" and "working" superfluous. "Predetermined" denotes that the working zone was selected from among possible alternatives. How is the entire table predetermined? What is the purpose of the word "working" if the working zone includes areas of the table where no work is performed? Recognizing this obvious flaw in its construction, Lectra argues that the word "predetermined" need not be construed as part of the claim term. Lectra Br. at 11, n.8. Even Lectra concedes (as it must) that a person of ordinary skill in the art understands that plotting or cutting along the entire surface of the table is a physical impossibility. Lectra Br. at 12. But inexplicably, Lectra concludes that Eastman's construction — which is consistent with this understanding — imposes an "extraneous limitation."

## IV.    <u>INTERMITTENTLY ADVANCED</u>

The parties agree that intermittently advanced means that the material is alternately advanced and halted through the working zone. Lectra Br. at 13; Eastman Br. at 16-17. Lectra includes extraneous language — "such that cutting

20

or plotting occurs both while the material is advancing and while it is stationary"
— which does not define the term and improperly adds a limitation.  Typically,
one would expect that Lectra, as the patentee, would argue for a broader
construction and would not argue, as it has here, for adding a limitation not found
in the claims.  But Lectra believes that there is prior art that will invalidate the '392
Patent if it is not limited to a machine that can cut **both** while the material is
stationary and advancing.[16]  Lectra seeks to add a non-existent limitation to the
claims of the '392 Patent to gain an improper advantage in the coming validity
challenge.

At page 14 of its Opening Claim Construction Brief, Lectra states that
it "does not believe Defendants seriously contest the fact that the invention claimed
in the '392 Patent cuts or plots both while the material is advancing and while
stationary."  Lectra Br. at 14.  Lectra is incorrect.  Eastman strenuously disputes
this point.  First of all, this feature that Lectra seeks to add to the claimed invention
appears nowhere in the claims, certainly not in the unambiguous phrase
"intermittently advanced."  Although Lectra contends that the invention of the '392
Patent requires cutting both while the material is stationary and while the material

---

[16]    *See, e.g.*, Ex. 3 at L01099-L01101, L01105-L01107, L01109-L01113.  *See also* Campbell patent (Ex. 21).

is advancing, Lectra never argues that this feature is actually claimed.  Lectra refers only to sections of the specification that purport to discuss this concept; it cites no limiting claim language.  Claims 1 and 7 are not in any respect limited to a machine that can cut *both* while the material is advancing and while it is stationary.

Lectra never explains what word in the term "intermittently advanced" it relies on to support its construction.  The word "intermittent" does not support a construction that requires cutting material both while it is advancing and while it is stationary.  The plain meaning of the word "advanced" does not support such a construction.  Those two words have plain and ordinary meanings upon which both parties agree, and they have nothing to do with the feature that Lectra now seeks to add to the invention.

Even if the specification disclosed this feature, it would be improper to add it to claims 1 and 7 as a limitation on the term "intermittently advanced."  In fact, this is precisely the situation where Lectra's argument on "importing" limitations from the specification applies.   Lectra is not defining an otherwise unknown phrase in the claim by reference to the specification (like Eastman has done with respect to "working window"); it is "adding an extraneous limitation"

22

that it believes is disclosed in the specification, but does not appear in the language of claims 1 or 7.[17]

Lectra has a bigger problem. The specification does not disclose the limitation it seeks to add to the claims, a point that is confirmed by the very sections of the specification that Lectra quotes at pages 14-15 of its Opening Claim Construction Brief. The quote from the specification at column 1, lines 50-60 discusses prior art systems that were not capable of cutting material while the material was advancing. Column 2, lines 23-45 discusses only the concept of cutting or plotting while the material advances along the conveyor — cutting on the fly. There is no discussion of a single machine that accomplishes both. Read in context, it is clear that the entire passage (col. 2:4-45) describes a method for cutting as the material advances along the conveyor.

**V.     A LENGTH IN THE DIRECTION<br>OF THE ADVANCE OF THE MATERIAL**

The plain language of independent claims 1 and 7 requires that the term "a length in the direction of the advance of the material" be construed as a

---

[17]     *Intervet Am., Inc.*, 887 F.2d at 1053. *See also* Manual of Patent Examining Procedure ("MPEP") § 2106 II.C (recognizing that limitations from the specification cannot be read into claims and must be recited in the claims).

defined, fixed length.  The claim language refers to "*a*" length, not several, changing lengths.  This use of the singular form clearly indicates that the working window has one length during the cutting job.[18]  This dispositively precludes Lectra's argument that the length of the working window can vary. Lectra Br. at 23-25.

Lectra contends that the specification provides support for a working window with a changing length.  *Id.* at 23-24.  This is simply incorrect.  The sections of the specification quoted by Lectra discuss how different fixed lengths for the working window can be selected for ***different cutting jobs***.  *See* col. 2:61-62 (half the length of the working zone); col. 6:22-24 (greater than half the length of the working zone, but less than the full length of the working zone). During his deposition, Mr. Hermann acknowledged that these sections of the specification describe the different lengths that can be selected for different cutting jobs.  Ex. 8 at 55-56, 60.  The '392 Patent never discloses a working window whose length changes during a cutting job.

Lectra also argues that only certain embodiments refer to a fixed length and that those embodiments do not "justify importing a limitation of a

---

[18]     *See* Ex. 20 (Webster's Ninth New Collegiate Dictionary).  The dictionary definition of "a" makes clear that the phrase "a length" refers to one length.

'fixed' length into the claims." Lectra Br. 24, n.15. This is untrue. *All* of the claimed embodiments of the '392 Patent disclose a working window that has a fixed length during a cutting job. Col. 5:15-6:49; FIGs. 2A-2D, 4A-4D.

Lacking intrinsic support, Lectra relies on the opinion of its expert, who claims that one of ordinary skill "would recognize from Figures 5A through 5D that the dimensions of the working window could change during a job." Lectra Br. at 24. As explained above, this opinion only demonstrates that figures 5A-5D do not depict a size-changing working window and that the concept is an undisclosed hypothetical one that exists only in Mr. Herman's mind. And perhaps more significant, those figures describe an implementation that was abandoned during prosecution and is not claimed.

## Conclusion

For the reasons discussed above and in the Defendants' Opening Claim Construction Brief, Eastman requests that the Court adopt its proposed constructions of the disputed terms in the '392 Patent and reject Lectra's proposed constructions.

25

Dated:  August 25, 2009

**HODGSON RUSS LLP**


By:  s/Robert J. Fluskey, Jr.
Robert J. Lane, Jr., admitted *pro hac vice*
*rlane@hodgsonruss.com*
Robert J. Fluskey, Jr., admitted *pro hac vice*
*rfluskey@hodgsonruss.com*
The Guaranty Building
140 Pearl Street, Suite 100
Buffalo, NY  14202-4040
716.856.4000

**BRYAN CAVE POWELL GOLDSTEIN**
Ryan Pumpian, Esq., GA Bar No. 589822
*rpumpian@bryancave.com*
One Atlantic Center – 14th Floor
1201 W. Peachtree St., NW
Atlanta, GA 30309
404.572.6581

## <u>CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 5.1C</u>

I hereby certify that the foregoing document was formatted in accordance with Local Rule 5.1C in Times New Roman font, 14 point type.

Dated:  August 25, 2009

**HODGSON RUSS LLP**

By:  <u>s/Robert J. Fluskey, Jr.</u>
Robert J. Lane, Jr., admitted *pro hac vice*
*rlane@hodgsonruss.com*
Robert J. Fluskey, Jr., admitted *pro hac vice*
*rfluskey@hodgsonruss.com*
The Guaranty Building
140 Pearl Street, Suite 100
Buffalo, NY  14202-4040
716.856.4000

27

## <u>LOCAL RULE 5.4 CERTIFICATE OF SERVICE</u>

    I hereby certify that, on August 25, 2009, a true and correct copy of Defendants' Responsive Claim Construction Brief was electronically filed and served upon the attorneys of record for Plaintiffs using the CM/ECF Filing System, which will automatically send email notification of such filing to the following attorneys of record:

        **ALSTON & BIRD LLP**
        Robin L. McGrath
        *Robin.mcgrath@alston.com*
        Brie A.L. Brown
        *Brie.brown@alston.com*
        1201 West Peachtree Street
        Atlanta, GA 30309-3424

        **FULBRIGHT & JAWORSKI L.L.P.**
        Peter F. Felfe
        *PFelfe@fulbright.com*
        Joseph P. Zammit
        *JZammit@fulbright.com*
        666 Fifth Avenue
        New York, New York  10103

        **HODGSON RUSS LLP**

        By:  <u>s/Robert J. Fluskey, Jr.</u>
        Robert J. Lane, Jr., admitted *pro hac vice*
        *rlane@hodgsonruss.com*
        Robert J. Fluskey, Jr., admitted *pro hac vice*
        *rfluskey@hodgsonruss.com*
        The Guaranty Building
        140 Pearl Street, Suite 100
        Buffalo, NY  14202-4040
        716.856.4000

28